[Civ. No. 4092.  Second Appellate District, Division One.—July 26, 1924.]

## LEW U. FON et al., Appellants, v. JOSEPH F. CHAMBERS et al., Respondents.

[1] CLAIM AND DELIVERY—SEIZURE OF SLIPS OF PAPER—LOTTERY TICKETS—CHARACTER OF EVIDENCE REQUIRED TO PROVE STATUS OF SLIPS.—In an action in claim and delivery to recover certain slips of paper seized by defendants on which plaintiffs claimed were portrayed Chinese poems and literature, but which defendants contended, and the trial court found, were lottery tickets and intended to be used as such, evidence beyond a reasonable doubt that such slips were in fact blank lottery tickets was not required, since the case was a civil case in which the rule is that the issue may be determined according to the probabilities arising from the preponderance of the evidence.

[2] ID.—CREDIBILITY OF WITNESSES—PROVINCE OF TRIAL JUDGE—APPEAL.—In such action, it was within the province of the trial

---

1.  See 10 Cal. Jur. 790; 10 R. C. L. 1012, 1014.

2.  Credibility of witnesses, note, 86 Am. Dec. 328. See, also, 28 R. C. L. 657.

judge to give credence to the testimony of any one witness, or to disbelieve or to reject the whole or any part of the testimony of any other witness; and if in exercising his prerogative in that regard there was any substantial evidence on which to base his finding that the slips in question were lottery tickets, it cannot, in the absence of an abuse of discretion on the part of the trial judge, be disturbed on appeal.

[3] ID.—SLIPS INTENDED AS LOTTERY TICKETS—FINDING—EVIDENCE.— In such action, the evidence, together with the inferences which may reasonably be drawn therefrom, was sufficient to support the finding of the trial court to the effect that the slips in question were lottery tickets.

[4] ID.—SIMILARITY OF SLIPS TO OTHER LOTTERY TICKETS—ADMISSI-BILITY OF EVIDENCE.—In such action, the trial court did not err in receiving evidence over plaintiffs' objection thereto that the slips taken from the plaintiffs by the officers were "similar" to lottery tickets used in other stores in Chinatown, the foundation for such evidence having been properly laid by showing the long experience of the witness in dealing in an official capacity with matters of the nature involved herein, and the similarity of the slips in question with completed lottery tickets having been fully explained.

[5] ID.—VIOLATION OF ORDINANCE—LOTTERY TICKETS SEIZED UNDER SEARCH-WARRANT—ACTION OF REPLEVIN WILL NOT LIE TO RECOVER POSSESSION.—The action of replevin (or claim and delivery) will not lie to recover the possession of certain slips of paper which were in fact blank lottery tickets and intended to be used as such in violation of an ordinance, and which were seized under a search-warrant and taken from the possession of plaintiffs under the provisions of section 1524 of the Penal Code.

(1) 23 C. J., p. 12, sec. 1744; 27 C. J., p. 1045, sec. 259.   (2) 4 C. J., p. 848, sec. 2833, p. 884, sec. 2855; 38 Cyc., p. 1945.   (3) 27 C. J., p. 1045, sec. 259.   (4) 22 C. J., p. 751, sec. 829.   (5) 27 C. J., p. 1045, sec. 259.

APPEAL from a judgment of the Superior Court of Los Angeles County.   Charles S. Burnell, Judge.   Affirmed.

The facts are stated in the opinion of the court.

Warren L. Williams and Seymour S. Silverton for Appellants.

3.   See 16 Cal. Jur. 715; 17 R. C. L. 1222, 1240.

4.   See 10 Cal. Jur. 807, 957; 11 R. C. L. 574.

5.   See 5 Cal. Jur. 156.

Jess E. Stephens, City Attorney, and Chas. B. MacCoy, Deputy City Attorney, for Respondents.

HOUSER, J.—Plaintiffs brought an action in claim and delivery against the defendants, who were respectively the police judge, the city prosecutor, the clerk of the police court, the chief of police, and a patrolman, to recover from them certain so-called merchandise consisting of pamphlets or paper leaflets on which it was alleged were portrayed Chinese poems and literature. The answer, besides containing a specific denial of nearly all the material allegations of the complaint, other than that the demand by plaintiffs for the merchandise and the refusal thereof by the defendants was admitted, set up the affirmative defense that the patrolman, having been informed that plaintiffs had in their possession tickets to be used in a lottery, "seized and took from said plaintiffs 29 boxes or cases containing slips of paper on which was and is written various Chinese characters; that said tickets or slips of paper were printed and designed to be used as and in connection with a lottery scheme and in furtherance of said lottery scheme, and were intended to be used and issued as lottery tickets in the operation of a lottery."

The findings of the court with reference to the nature of the slips of paper were that at the time referred to in the complaint they were taken by the patrolman, and at such time were the property of the plaintiffs; that they were not in pamphlet form, but that such slips of paper constituting the contents of said twenty-nine boxes "bear the same Chinese characters and are identical in form; that said tickets or slips were not designed or intended to be sold as literature or used as such"; that said patrolman (referring to one of the defendants) "on or about the 9th day of August, 1921, having reasonable cause to believe that the contents of said boxes were designed to be used as and in connection with a lottery scheme and in furtherance of said lottery scheme, and were intended to be used and issued as lottery tickets in the operation of a lottery, and acting under and by virtue of a search warrant issued on the 9th day of August, 1921, . . . seized and took from said plaintiffs twenty-nine boxes containing tickets or slips of paper on which were or are written Chinese poems and literature in various Chinese

characters; that said tickets or slips of paper were printed and designed to be used as and in connection with a Chinese lottery scheme and in furtherance of said lottery scheme and were intended to be used and issued as lottery tickets in the operation of a Chinese lottery."

Appellants first contend that the finding by the court to the effect that the slips taken from the plaintiffs were lottery tickets, or lottery tickets in an unfinished state, intended for no other use than as lottery tickets or lottery material, is not sustained by the evidence. At the outset, it is admitted by appellants that if the possession of the slips by the plaintiffs came under the prohibition of Ordinance No. 37737, New Series, of the city of Los Angeles, the taking of such slips by the officers was lawful and is determinative of the appeal.

Section 1 of the ordinance in question provides that it shall be unlawful for any person to have in his possession "any ticket . . . paper . . . or any other object used or intended to be used in a lottery"; and section 4 thereof makes it unlawful for any person to have in his possession "any ticket . . . paper . . . or any other object used or intended to be used for contriving, preparing, setting up, or drawing any lottery, or used or intended to be used for contriving, setting up, preparing, marking, printing, stamping, writing, or getting ready for sale, or distribution, any lottery ticket, or lottery tickets." Section 6 of the ordinance provides that "in all cases, proof of the fact that such . . . paper . . . ticket . . . device, or other object, is used or intended to be used . . . or is understood to belong to, or to be a part of, or relates to, any lottery, lottery company, lottery tickets, or lottery drawing, is sufficient."

While but one box of the "merchandise" was opened by the officers, the action was for the recovery of the possession of the full number of twenty-nine boxes under the allegation that they contained "Chinese poems and literature in pamphlet form"; and the admission of one of the defendants was in substance that "the boxes all contained the same as the one we had opened." The testimony given by one of the officers who served the search-warrant was that he had been stationed as a police officer in Chinatown for six and one-half years; that he had seen slips similar to those in question in nearly every place in Chinatown, and that

they were used as lottery tickets; that he was familiar with Chinese lottery tickets by reason of many raids in which he had participated and in which raids lottery tickets were seized and thereafter used as evidence against the persons arrested in such raids; that the only difference between the tickets here in question and the lottery tickets seized in such raids was that "the other tickets of course were marked in here (indicating) over the Chinese characters and the name of the lottery company and the amount for which the company was capitalized, and also there would be the name in Chinese characters on it, and the amount which the ticket was played for."

The only evidence which might be considered as in any way contradicting the testimony to which reference has just been had was that of one of the plaintiffs, who testified that he did not know the use for which the slips were intended; that on each of the slips were eighty characters representing different poems, and which slips were sold at wholesale to "other stores and to school children." In this connection, it is significant that the slips were loose-leaf and were "tied in a bunch"; that they were sold only a "whole case at a time," and at a rate of forty-two cents a pound. While it is possible that these slips may have been useful for some purpose other than as lottery tickets, the evidence does not show that they were ever put to any other use, or that anyone other than one of the plaintiffs ever considered them as literature. The fact that they were tied up in bundles and were sold by the pound negatives any such idea, although such a method of sale of "poems and literature" perhaps in some cases might well be emulated by enterprising merchants of other nationalities. On the other hand, that they were identical with lottery tickets used in other stores in Chinatown, excepting that they were not marked, nor had thereon the name of the lottery company issuing the tickets, nor its capitalization, nor the amount for which the ticket was played, would indicate that they were stock lottery tickets, ready to be sold to different lottery companies, requiring only the filling in of the details just noted.

The fact that the slips had printed thereon Chinese characters representing eighty different poems, or "one poem with eighty different meanings," is of no great consequence. So far as their use as lottery tickets is concerned, apparently

in the place of the Chinese characters, there might as well have been used eighty different numerals.   [1]   The case is not one requiring evidence beyond a reasonable doubt that these slips of Chinese poems and literature were in fact blank lottery tickets; but it is a civil case in which the rule is that the issue may be determined according to the probabilities arising from the preponderance of the evidence.   [2]   It was clearly within the province of the trial judge to give credence to the testimony of any one witness, or to disbelieve or to reject the whole or any part of the testimony of any other witness; and if in exercising his prerogative in that regard there was any substantial evidence on which to base his finding, it cannot, in the absence of an abuse of discretion on the part of the trial judge, be disturbed on appeal.   [3] That the evidence, together with the inferences which may reasonably be drawn therefrom, is sufficient to support the conclusion reached by the trial judge we entertain no doubt. It therefore follows that appellants' contention with reference to the finding of the court cannot be sustained.

[4]   It is also urged that the trial court erred in receiving evidence over plaintiffs' objection thereto that the slips taken from the plaintiffs by the officers were "similar" to lottery tickets used in other stores in Chinatown.   The foundation for such evidence was properly laid by showing the long experience of the witness in dealing in an official capacity with matters of the nature involved herein, and the similarity of the slips in question with completed lottery tickets was fully explained.   In such circumstances, we are unable to perceive that the court erred in admitting the testimony.

Plaintiffs finally urge that because under the powers created by the search-warrant the officers took merchandise which was in plaintiffs' possession for lawful purposes, and because no criminal complaint had ever been filed against plaintiffs up to the time the action herein was tried, the plaintiffs were entitled to a return of the seized property. What has heretofore been said with reference to the nature of the slips and their intended use will suffice as an answer to the first part of plaintiffs' contention.   Regarding the latter part, the only authority cited by appellants is the case of *Modern Loan Co.* v. *Police Court,* 12 Cal. App. 582 [108 Pac. 56], which had to do with the jurisdiction of the police

court to try *ex parte* the question of title to some personal property which had been taken on a search-warrant from the possession of the pledgee thereof; and the court held that "one who is in possession of property under a claim of right cannot be deprived of its possession without due process of law; and in order to constitute due process of law, there must be notice of the time and place of hearing and an opportunity to be heard."

On the other hand, many cases are cited by respondents which in principle sustain the judgment of the trial court. In the case of *Collins* v. *Lean,* 68 Cal. 284 [9 Pac. 173], a search-warrant authorized an officer to search the person of an individual for lottery tickets. Such search failed to reveal any lottery tickets, but the room of the individual contained a package of one hundred lottery tickets, which was found and seized under the search-warrant. It was held that an action to recover the lottery tickets would not lie. Among other things, the court said: "Conceding all that the plaintiff claims as to the tickets being his property, and that he cannot be deprived of them as such without due process of law under most circumstances, yet nevertheless, it is firmly settled by the law that all rights of property are held subject to such reasonable and proper control of the mode of its keeping and use as may be deemed necessary for and in consonance with the welfare of the general public. And in the exercise of the police power vested in the legislature under our state constitution, certain kinds of property, when held or used so as to be injurious to the general public, may be seized and destroyed."

In the case of *J. B. Mullen & Co.* v. *Moseley,* 13 Idaho, 457 [90 Pac. 986], an action in replevin was brought to recover certain slot machines from the possession of the sheriff, and it was held on the authority of many cited cases that such an action would not lie where the subject matter was designed and intended only for use in the commission of a criminal offense.

In the case of *Stanley-Thompson Liquor Co.* v. *People,* 63 Colo. 436 [168 Pac. 750], it was likewise held as to certain gambling devices which prior to their seizure had been in storage for three years and which had never been used for the purpose for which they were manufactured or intended.

In *Board of Police Commrs.* v. *Wagner*, 93 Md. 182 [86 Am. St. Rep. 423, 52 L. R. A. 775, 48 Atl. 455], it was held that replevin would not lie to recover a slot machine, *even though no criminal proceedings had been instituted as against the owner thereof either before or after its seizure.*

In *Robertson* v. *Porter*, 1 Ga. App. 223 [57 S. E. 993], trover was instituted against the sheriff to recover the possession of "1 large oak table, with carved legs, worth $145; 1 roulette wheel, with complete appliances, worth $400; 1 bookmaker's wheel, worth $150; 1 large walnut table, worth $60; 1 long oak table, with rounded corners, worth $90; 1 round oak table, worth $25; 5,000 composition discs or chips, worth $175; 1 cribbage or faro layout, $25; 1 glass layout for bookmaker's wheel, worth $40; 1 long pine table, worth $12; 1 lot playing cards, worth $10; and 1 lot dice, worth $5." Although it is apparent that many of such articles might have been useful for other than gambling purposes, it was held that the plaintiff could not recover. In the course of the opinion it is said:

"Courts are created for the upholding of the law and of morals, and will therefore decline to allow their processes used to further the maintenance of crimes and public evils. The law has the right of self-defense. It will not, by its own strong arm, assist in placing into the possession of any one instrumentalities designed for no other purpose than the breaking of the law. It will not protect the owner of a house devoted to lewd purposes, as to his rents. (*Ralston* v. *Boady*, 20 Ga. 449); the mistress of a lewd house, as to her contracts with inmates (*Postelle* v. *Rivers*, 112 Ga. 850 [38 S. E. 109]); unlawful assemblages, as to their common fund (*Regina* v. *Hunt*, 8 Car. & P. 642); the milk dealer, as to his milk watered in violation of law (*Deems* v. *Baltimore*, 80 Md. 164 [45 Am. St. Rep. 339, 26 L. R. A. 541, 30 Atl. 648]); the 'blind tiger' keeper, as to his liquors (*State* v. *O'Neal*, 58 Vt. 162 [56 Am. Rep. 557, 2 Atl. 586]); the indecent individual, as to his obscene prints and lascivious pictures; the gambler, as to his slot machines (*Board of Police Commrs.* v. *Wagner*, 93 Md. 182 [86 Am. St. Rep. 423, 48 Atl. 455]); or as to his poker chips (*Bales* v. *State*, 3 W. Va. 687); the burglar, as to his kit, or the counterfeiter, as to his molds and coins (*Spalding* v. *Preston*, 21 Vt. 9 [50 Am. Dec. 68]); the highwayman, as to his spoils

(opinion of Lord Ellenborough, referred to on page 16 of case last cited) ; nor will it protect the keeper of a gaming-house, as to his paraphernalia and implements of crime (*Kneeland* v. *Connally,* 70 Ga. 424)."

[5] From a reading of those portions of the ordinance quoted herein, there can be no doubt of its applicability to the facts involved in this controversy. The finding of the court, which is sustained by the evidence, is to the effect that the slips on which were printed the so-called poems and literature were in fact but blank lottery tickets, which were seized under a search-warrant and taken from the possession of the plaintiffs under the provisions of the statute (sec. 1524, Pen. Code). Considering the purposes for which the slips were intended, the authorities are practically unanimous in announcing the doctrine that replevin (or claim and delivery) will not lie. It therefore follows that the judgment was right and should be affirmed. It is so ordered.

Conrey, P. J., and Curtis, J., concurred.